UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TONI HAWTHORNE,

           Plaintiff,

    vs.

ZURICH AMERICAN INSURANCE
COMPANY, GOODRICH CORPORATION,
and GOODRICH CORPORATION
EMPLOYEE BENEFITS PLAN or
ACCIDENT INSURANCE PLAN,

           Defendants.

No. CV06-0374RSL

ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT AND DENYING IN
PART AND GRANTING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

## I. INTRODUCTION

This matter comes before the Court on "Plaintiff's Motion for Summary Judgment or, in the Alternative, Confirming Trial De Novo and Ordering a Court-Appointed Toxicology Expert" (Dkt. #13) and "Defendants' Motion for Summary Judgment" (Dkt. #16). Plaintiff has filed this action to recover benefits under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"). She seeks an order requiring defendants to pay and disburse the proceeds of her deceased husband's accidental death and dismemberment ("AD&D") insurance policy. Defendants argue that their denial of coverage should be upheld and that plaintiff's claims should be dismissed. For the reasons discussed below, plaintiff's motion is granted.

## II.  FACTUAL BACKGROUND

**A.  The Policy**

Darren Hawthorne, plaintiff's husband, worked as an avionics technician at Goodrich Corporation ("Goodrich") in Everett, Washington.  As a Goodrich employee, Mr. Hawthorne was enrolled in the company's AD&D employee benefit plan.  In addition to paying premiums for basic accidental death benefits, Mr. Hawthorne also paid premiums for a supplement.  According to defendants, Mr. Hawthorne's accidental death benefits under the plan totaled $215,000.  Plaintiff was the named beneficiary.

To fund its employee AD&D Plan, Goodrich purchased two group AD&D policies from Zurich American Insurance Company ("Zurich American").  Both policies provide in relevant part: "If an Insured dies as a result of an Injury, We will pay the Principal Sum.  The death must occur within 365 days of the Injury."  Declaration of Bruce E. Jones (Dkt. #14) ("Jones Decl."), Exs. A, B.  Injury is defined as "a bodily injury directly caused by accidental means which is independent of all other causes, results from a Hazard, and occurs while the Covered Person is insured under this Policy."  Id.  The policies also contain the following exclusion: "A loss shall not be a Covered Loss if it is caused by, contributed to, or resulted from . . . 1.  suicide, attempted suicide, or a purposeful self-inflicted wound."  Id.

**B.  The Accident**

Darren Hawthorne died early on the morning of February 8, 2004 after being ejected from his pickup truck which had left the road, rolled and struck a power pole.  Mr. Hawthorne was returning home from work at Goodrich at the time of the accident.  The Snohomish County Medical Examiner concluded that the immediate causes of death were "basilar skull fractures and multiple visceral lacerations due to blunt impact to the head and trunk."  Jones Decl., Exs. J, K.  An autopsy was conducted and a blood sample was drawn from Mr. Hawthorne's chest cavity.  Toxicology tests performed by the Washington State Toxicology Laboratory using that

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-2

1  blood sample indicated the presence of .28 mg/L of alprazolam, .34 mg/L of fluoxetine, and .36

2  mg/L of norfluoxetine.  Jones Declaration, Ex. L.  Alprazolam is a prescription drug marketed

3  under the name Xanex, fluoxetine is a prescription drug marketed under the name Prozac, and

4  norfluoxetine is a metabolite of fluoxetine.  There is no evidence to indicate that alcohol or any

5  illegal substances played a role in Mr. Hawthorne's death.

6  **C.     Underlying ERISA Administrative Proceedings**

7           Plaintiff, as the named beneficiary under Mr. Hawthorne's AD&D policy, submitted a

8  claim to Goodrich's benefits office in March 2004.  After communicating with Goodrich and

9  receiving proof of death and benefits records by plaintiff's life insurer, Zurich American opened

10 a new claim on April 1, 2004.

11          On April 24, 2004, Zurich American contacted Dr. Thomas Manning and asked him to

12 "review the toxicology results and provide your medical opinion as to whether the medications

13 were taken in the prescribed dosages, whether the medications can safely be taken together and

14 whether the medications, in the amounts taken, could have contributed to the motor vehicle

15 accident."  Declaration of Karen Doyle ("Doyle Decl.") (Dkt #19), Ex. 10.  Dr. Manning's

16 report concluded that "Mr. Hawthorne was under the influence of the sedating drug Alprazolam

17 at the time of the accident which caused his death and that the degree of his intoxication with

18 this drug was at least contributory if not the cause of the accident."  Doyle Decl., Ex. 14.  He

19 also stated his belief that Mr. Hawthorne would have had "at least 21-30 mgs of alprozalam [sic]

20 in his system at the time of his death."  Id.  Based on Dr. Manning's conclusions, Zurich

21 American notified plaintiff that it was denying accidental benefits because Mr. Hawthorne's

22 death came within the "self-inflicted wound" exclusion or, alternatively, was not the result of an

23 "accident."  Jones Decl., Ex. D.

24          On September 29, 2004, plaintiff's attorney notified Zurich American that Dr. Manning

25 overstated the concentration of alprazolam by a magnitude of ten in his report.  Defendants now

26

27 ORDER GRANTING PLAINTIFF'S MOTION
   FOR SUMMARY JUDGMENT AND DENYING
   IN PART AND GRANTING IN PART DEFENDANTS'
28 MOTION FOR SUMMARY JUDGMENT-3

concede that an error was made and admit that "it is not clear whether this was merely a typographical error or whether Dr. Manning actually misinterpreted the toxicology report and incorporated a substantive error into his opinion."[1]   Defendants' Motion at pp. 6-7 n. 5.

From October 2004 through March 2005 Zurich American's ERISA Review Committee ("Review Committee") reviewed the matter and considered additional materials provided by plaintiff's attorney.   These additional materials included chart notes from Mr. Hawthorne's physician Dr. Eileen de la Cruz, a report describing the accident history of the scene of Mr. Hawthorne's death by engineer Kenneth Cottingham, and a letter from toxicologist David Predmore challenging the reliability of the State's post-mortem toxicology results.   Jones Decl., Exs. I, N, and O.   On March 22, 2005, the Review Committee sent Mr. Hawthorne's file to the referral company MedNet so that a new expert could review the accuracy and validity of the original toxicology report.   Doyle Decl., Ex. 23.

On April 5, 2005, Zurich American received a report from Dr. Gaylord Lopez, Director of the Georgia Poison Center.   Doyle Decl., Ex. 25.   The report concluded that Mr. Hawthorne had therapeutic levels of fluoxetine in his blood at the time of death, but approximately ten times the therapeutic level of alprazolam.   Id.   The report also concluded that "[t]he combination of both fluoxetine and alprazolam would have additive effects on an individual subjecting them to more central nervous system effects like dizziness, drowsiness, and sleepiness" and that "[t]hese drugs in combination impaired his ability to operate his motor vehicle and causing him to leave the road and lose control of that vehicle."   Id.   Though Dr. Lopez agreed with Dr. Manning's overall conclusion that "Mr. Hawthorne was driving under the influence of alprazolam and that this drug was at least contributory if not the cause of the accident," he noted that Dr. Manning had misstated the actual concentrations of the relevant substances in Mr. Hawthorne's body and

_____

[1] Because Dr. Manning passed away shortly after submitting his report to Zurich American, it is impossible to conclusively determine the reason for the error.

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-4

1   disagreed with Dr. Manning's assessment that the actual dosage of alprazolam ingested by Mr.

2   Hawthorne prior to death could be accurately estimated.  Id.  Dr. Lopez himself offered no

3   conclusions as to whether Mr. Hawthorne took more then his prescribed dosage of alprazolam

4   prior to his death.

5   　　　On April 16, 2005, Zurich retained the Research Service Bureau ("RSB") for the purpose

6   of contacting Mr. Hawthorne's physician, Dr. Eileen de la Cruz, "to determine what, if any,

7   instructions and/or warnings are given to a patient when prescribing alprazalam [sic]" and to

8   have an investigator "canvass the neighborhood pharmacies to determine what literature is

9   provided when dispensing the prescription for alprazalam [sic] to the customer."  Doyle Decl.,

10  Ex. 26.  On June 24, 2005, RSB received a letter from Dr. de la Cruz explaining that she had

11  reviewed her chart notes and they indicated that she advised Mr. Hawthorne to avoid drinking

12  alcohol with his medication.  Doyle Decl., Ex. 27.  She also noted that she "typically" warned

13  patients that alprazolam "can cause sedation and should be avoided if driving."  Id.  Her chart

14  notes, however, make no reference to warnings relating to driving while taking alprazolam.

15  Jones Decl., Ex. I.

16  　　　Zurich American denied plaintiff's appeal on July 27, 2005, relying primarily on

17  evidence derived from Dr. Lopez's report and Dr. de la Cruz's chart notes.  In explaining its

18  denial, Zurich American cited the legal standard contained in Wickman v. Northwestern Nat'l

19  Ins. Co., 908 F.2d 1077 (1st Cir. 1990) and explained:

20  　　　　　The committee determined that a reasonable person with the Insured's
        background and characteristics would have known the risks of operating a
21      motor vehicle while taking the prescribed dosage of alprazolam in
        combination with other drugs.  The administrative record supports the
22      finding that the Insured had taken more than the prescribed dosage of
        alprazolam based upon the level of alprazolam in his system at the time of
23      his death.  The Committee determined that a reasonable person with the
        Insured's background and characteristics would have known the risks of
24      operating a motor vehicle while taking a higher dosage of alprazolam than
        prescribed and in combination with other drugs and would have viewed
25      injury as highly likely to occur.

26

27  ORDER GRANTING PLAINTIFF'S MOTION
    FOR SUMMARY JUDGMENT AND DENYING
    IN PART AND GRANTING IN PART DEFENDANTS'
28  MOTION FOR SUMMARY JUDGMENT-5

1   Jones Decl., Ex. P.

2   On August 8, 2005 plaintiff's attorney sent a letter to Goodrich protesting Zurich

3   American's denial of benefits.  Jones Decl., Ex. R(1).  In the letter, plaintiff again challenged the

4   reliability of the post-mortem blood samples and questioned the assumptions underlying Zurich

5   American's conclusion that Mr. Hawthorne should have known that he was substantially likely

6   to die as a result of driving after taking alprazolam.  Goodrich forwarded plaintiff's letter to

7   Zurich American, which received it on August 24, 2005.  Doyle Decl., Ex. 30.

8   In response to plaintiff's letter, the Review Committee sought the opinion of another

9   outside toxicologist and asked Dr. Lopez to respond to plaintiff's arguments.  Dr. Lopez

10  provided an updated report on October 12, 2005.  Jones Decl., Ex. S.  In the report, Dr. Lopez

11  restated his conclusion that "the presence of fluoxetine and extremely high levels of alprazolam

12  significantly contributed to the unfortunate and untimely death of Mr. Darren Hawthorne."  Id.

13  He also challenged the foundations of plaintiff's previous arguments against the reliability of

14  testing post-mortem blood samples to determine the particular concentration of a drug at the time

15  of death.  Dr. Lopez acknowledged that post-mortem redistribution occurs, but not with all drugs

16  and not consistently.  In this instance, he concluded that redistribution was not responsible for

17  the abnormally high levels of alprazolam found in Mr. Hawthorne's blood because the levels of

18  fluoxetine were at normal therapeutic concentrations.  Given the characteristics of each drug, if

19  redistribution were to have occurred, it would have caused the concentrations of fluoxetine

20  found in Mr. Hawthorne's blood to have been even higher than the levels of alprazolam.  Again,

21  Dr. Lopez offered no conclusions on the dosage of alprazolam consumed by Mr. Hawthorne

22  prior to his death.

23  Zurich American received its final expert report on October 21, 2005 from Dr. Patricia

24  Rosen.  Jones Decl., Ex. T.  Dr. Rosen's report consists of a string of sometimes unclear

25  responses to questions posed by Zurich American.  For that reason, it is difficult to characterize

26

27  ORDER GRANTING PLAINTIFF'S MOTION
    FOR SUMMARY JUDGMENT AND DENYING
    IN PART AND GRANTING IN PART DEFENDANTS'
28  MOTION FOR SUMMARY JUDGMENT-6

her actual conclusions on some issues.  That said, Dr. Rosen clearly concluded that "it is likely that the patient had a clinical effect from Alprazolam at the time of the accident that would have impaired his operation of the vehicle."  Id.  And though she voiced some support for Dr. Lopez's conclusion that redistribution could not provide a complete explanation for the high levels of alprazolam in Mr. Hawthorne's system, she did not indicate that redistribution had no impact. Id.  In fact, Dr. Rosen identified a number of reasons why the toxicology report likely overstated the concentration of alprazolam in Mr. Hawthorne's body at the time of death.  Id.  She also indicated that the presence of fluoxetine could have artificially inflated the amount of alprazolam found in Mr. Hawthorne's system and that this fact prevented her from concluding that Mr. Hawthorne had taken a larger than prescribed dose of alprazolam prior to his death.  Id.

Relying on the new reports from Dr. Lopez and Dr. Rosen, Zurich American proceeded to again deny plaintiff's appeal on November 29, 2005.  Jones Decl., Ex. U.  On the same day of the denial, Zurich American received a letter from plaintiff's counsel accusing it of "opinion shopping," demanding production of documents, and enclosing another article on the problem of post-mortem redistribution of drugs.  Doyle Decl., Ex. 35.  On December 22, 2005, Zurich American notified plaintiff that based on the opinions of Dr. Lopez and Dr. Rosen it was standing by the toxicology results.  Doyle Decl, Ex. 37

On January 10, 2006 plaintiff provided Zurich American with the report of Dr. Barry Levine, the Chief Medical Examiner for the State of Maryland and co-author of a paper on alprazolam intoxication, who concluded that the toxicology results were unreliable.  Jones Decl., Ex. V.  In his report, Dr. Levine challenged the scientific reliability for determining the dosage of alprazolam consumed by Mr. Hawthorne based on a single post-mortem measurement and argued that the drug interaction between fluoxetine, alprazolam and potentially ranitidine (Zantac) would "give the appearance that a larger dose" of alprazolam was taken.  Id.

Zurich American declined to follow up on Dr. Levine's report or to seek the reaction of

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-7

1    its own experts to his conclusions.  On February 6, 2006, Zurich American again confirmed its

2    denial of benefits:

3           Based upon the totality of the administrative record, the Committee upheld
            its finding that the Insured had taken more than the prescribed dosage of
4           alprazolam based upon the level of alprazolam in his system at the time of
            death.  The Committee also upheld its decision that based upon applicable
5           federal common law, the above Claims were properly denied.

6    Doyle Decl., Ex. 38.

7                                    **III.  DISCUSSION**

8    **A.    Summary Judgment Standard in an ERISA Context**

9           Summary judgment is typically appropriate "if the pleadings, depositions, answers to

10   interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

11   genuine issue as to any material fact and that the moving party is entitled to a judgment as a

12   matter of law."  Fed. R. Civ. P. 56(c).  In the ERISA context, however, "'the district court sits

13   more as an appellate tribunal than as a trial court'; instead of considering affidavits submitted to

14   the court, it 'evaluates the reasonableness of an administrative determination in light of the

15   record compiled before the plan fiduciary.'"  Denmark v. Liberty Life Assurance Co. of Boston,

16   481 F.3d 16, 26 (1st Cir. 2007) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir.

17   2002)).  At oral argument, both parties agreed that the Court would not examine the record to

18   identify disputed questions of material fact for a later trial, but would instead make an ultimate

19   determination as to whether Zurich American abused its discretion in light of the record before it

20   at the time of its decision to deny plaintiff benefits.  See Lawrence v. Motorola Inc., 2006 WL

21   2460921, at *3-4 (D. Ariz. Aug. 24, 2006) (approaching abuse of discretion inquiry in an ERISA

22   denial of benefits case in a similar fashion).

23   **B.    Applicable Law**

24          Defendants argue that this Court should apply the law of the Fourth Circuit rather than

25   the Ninth Circuit because the choice of law clause of the AD&D policies at issue states that the

26

27   ORDER GRANTING PLAINTIFF'S MOTION
     FOR SUMMARY JUDGMENT AND DENYING
     IN PART AND GRANTING IN PART DEFENDANTS'
28   MOTION FOR SUMMARY JUDGMENT-8

1   laws of North Carolina should apply.  See Defendants' Motion at p. 14.  In support of their

2   argument, defendants argue that Wang Laboratories, Inc. v. Kagan, 990 F.2d 1126, 1128-29 (9th

3   Cir. 1993) stands for the broad proposition that "[w]here a choice of law is made by an ERISA

4   contract, it should be followed, if not unreasonable or fundamentally unfair."  Wang, however,

5   involved the question of whether a choice of law provision could be looked to in deciding which

6   state's statute of limitations law would be applied.  It is well established that courts typically

7   "will borrow the forum state's statute of limitations governing breach of contract claims for

8   ERISA collection actions so long as application of the state statute's time period would not

9   impede effectuation of federal policy."  Pierce County Hotel Employees and Rest. Employees

10  Health Trust v. Elks Lodge, 827 F.2d 1324, 1328 (9th Cir. 1987).

11          Defendants seek to use the choice of law provision for a much different purpose than the

12  one present in Wang.  Here, defendants seek to require a district court sitting in the Ninth Circuit

13  to apply the law of the Fourth Circuit on questions of federal common law.  In evaluating

14  questions of policy interpretation under ERISA, as is the case here, federal courts apply only

15  federal common law.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989).  When

16  applying federal common law, "[b]inding precedent for all [courts] is set only by the Supreme

17  Court, and for the district courts within a circuit, only by the court of appeals for that circuit [in

18  the absence of Supreme Court authority]."  Newton v. Thomason, 22 F.3d 1455, 1460 (9th Cir.

19  1994) (quoting In re Korean Air Lines Disaster, 829 F.2d 1171 (D.C. Cir. 1987)).  On questions

20  of federal common law, this Court is therefore bound by the precedent of only the Supreme

21  Court and the Ninth Circuit.

22  **C.      Standard of Review**

23          **1.      Was authority delegated?**

24          The Supreme Court has held that "[a] denial of benefits challenged under [29 U.S.C.] §

25  1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the

26

27  ORDER GRANTING PLAINTIFF'S MOTION
    FOR SUMMARY JUDGMENT AND DENYING
    IN PART AND GRANTING IN PART DEFENDANTS'
28  MOTION FOR SUMMARY JUDGMENT-9

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone</u>, 489 U.S. at 115.   Where discretionary authority is granted, the Court will review the decision of the administrator for an abuse of discretion.  <u>Bergt v. Retirement Plan for Pilots Employed by Mark Air, Inc.</u>, 293 F.3d 1139, 1142 (9th Cir. 2002).

In this instance, discretionary authority was explicitly granted to the plan administrator in the Goodrich ERISA Plan:

### ARTICLE 10 PLAN ADMINISTRATION

#### 10.1 Plan Administrator

**(a)** **Responsibility of Plan Administrator**.  The Plan Administrator shall have total and exclusive responsibility to control, operate, manage and administer the Plan in accordance with its terms.

**(b)** **Authority of the Plan Administrator**.  The Plan Administrator shall have all the authority that may be necessary or helpful to enable the Plan Administrator to discharge the responsibilities with respect to the Plan.  Without limiting the generality of the preceding sentence, the Plan Administrator shall have the exclusive right: to interpret the Plan; to determine eligibility for Coverage; to determine eligibility for Benefits; to construe any ambiguous provision of the Plan; to correct any default; to supply any omission; to reconcile any inconsistency; and to decide any and all questions arising in the administration, interpretation, and application of the Plan.

**(c)** **Discretionary Authority.**  The Plan Administrator shall have full discretionary authority in all matters related to the discharge of the responsibilities and the exercise of the authority under the Plan including, without limitation, the construction of the terms of the Plan and the determination of eligibility for Coverage and Benefits.  It is the intent of the Plan that the decisions of the Plan Administrator and the actions with respect to the Plan shall be conclusive and binding upon all persons having or claiming to have any right or interest in or under the Plan and that no such decision or action shall be modified upon judicial review unless such decision or action is proven to be arbitrary or capricious.

**(d)** **Delegation of Authority.**  The Plan Administrator may delegate some or all of the authority under the Plan to any person or persons provided that any such delegation shall be in writing.

Declaration of Cynthia G. Pitesa (Dkt #19) ("Pitesa Decl."), Ex. 1.  In the May 2004 Summary Plan Description ("SPD"), Zurich American was identified as the Claims Administrator and was granted authority to evaluate claims:

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-10

If you or your Beneficiary feel that you don't receive the benefits to which you're entitled, you or your Beneficiary may file a written appeal with the Claim Administrator.
. . .
If you disagree with the Claims Administrator's decision regarding your appeal, you then may file an appeal with the Plan Administrator.  The Plan Administrator's benefits Appeals Committee has the authority to make final decisions with respect to paying claims under the plan.
In making a final decision, the Benefits Appeals Committee has sole, absolute and discretionary authority, which shall be final and binding on the participants and all other parties to the maximum extent allowed by law in interpreting the meaning of plan provisions and in determining all questions arising under the plan, including, but not limited to, eligibility for benefits.

Pitesa Decl., Ex. 2.

Plaintiff does not dispute that discretion was explicitly granted in Goodrich ERISA Plan, but instead argues that the delegation of authority to review claims to Zurich American cannot be valid because the SPD was not issued until three months after Mr. Hawthorne's death. Defendants contend that the determinative documents in an ERISA claim are those in effect at the time of an adverse decision and that because the SPD was in effect prior to any determination of plaintiff's claim was made it should be valid.  The Court agrees that it is the date of an adverse decision that is determinative.  See Dames v. Paul Revere Life Ins. Co., 49 F. Supp. 2d 1194, 1200 (D. Or. 1999).

There are also a number of other factors that compel the Court to recognize the applicability of the SPD to this case.  First, plaintiff has not argued that the SPD was issued in bad faith in response to the events at issue here.  See Mizzel v. Paul Revere Ins. Co., 278 F. Supp. 2d 1146, 1149-50 (C.D. Cal. 2003) (where benefits summary granting discretionary powers was issued after plaintiff had submitted claim, abuse of discretion review is still appropriate "where there is no suggestion of collusion").  Further, Mr. Hawthorne would have been aware that full discretion was granted to the Plan Administrator when he enrolled in the Plan.  The only change at issue here is the delegation of some of the Plan Administrator's powers to Zurich American.  For these reasons, the Court concludes that discretion was

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-11

1  explicitly granted and that abuse of discretion is therefore the appropriate standard of review.

2

3  **2.     Was there a conflict of interest?**

4        Though an abuse of discretion standard is appropriate when discretionary authority is

5  granted, the existence of a conflict of interest is relevant to how the Court conducts its abuse of

6  discretion review.  See Firestone, 489 U.S. at 115.  It is generally accepted that a "structural

7  conflict of interest" exists when an insurer has discretionary authority and is the funding source

8  of the benefits at issue.  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 967 (9th Cir.

9  2006).

10       Defendants acknowledge the facts of this case create the potential for a conflict of

11  interest, but argue that the Ninth Circuit requires a plaintiff to first produce "material, probative

12  evidence" that the conflict caused the insurer to breach its fiduciary duties before a more

13  searching analysis is conducted by the Court.  See Defendants' Motion at pp. 16-17 (citing

14  Hensley v. Northwest Permanente P.C. Ret. Plan & Trust, 258 F.3d 986, 994-95 (9th Cir.

15  2001)).  The Ninth Circuit, however, recently overruled this approach in its entirety citing the

16  fact that it places an undue burden on plaintiffs to produce "smoking gun" evidence that a plan

17  participant is unlikely to possess.  Abatie, 458 F.3d at 966-67.

18       Under the new test, courts must still apply an abuse of discretion standard whenever an

19  ERISA plan grants discretion to the plan administrator, but that review must be "informed by the

20  nature, extent, and effect on the decision-making process of any conflict of interest that may

21  appear in the record."  Id. at 967.  The court in Abatie described this review as follows:

22           We recognize that abuse of discretion review, with any "conflict . . .
             weighed as a factor," Firestone, 489 U.S. at 115, 109 S.Ct. 948, is
23           indefinite. We believe, however, that trial courts are familiar with the
             process of weighing a conflict of interest. For example, in a bench trial the
24           court must decide how much weight to give to a witness' testimony in the
             face of some evidence of bias. What the district court is doing in an ERISA
25           benefits denial case is making something akin to a credibility determination
             about the insurance company's or plan administrator's reason for denying
26

27  ORDER GRANTING PLAINTIFF'S MOTION
    FOR SUMMARY JUDGMENT AND DENYING
28  IN PART AND GRANTING IN PART DEFENDANTS'
    MOTION FOR SUMMARY JUDGMENT-12

> coverage under a particular plan and a particular set of medical and other records. We believe that district courts are well equipped to consider the particulars of a conflict of interest, along with all the other facts and circumstances, to determine whether an abuse of discretion has occurred.

Id. at 969.  "A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage.  An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might."  Id.  The level of skepticism applied will be low if "a structural conflict of interest is unaccompanied, for example, by any evidence of malice, or self-dealing, or of a parsimonious claims-granting history."  Id. Examples of situations where a court may weigh a conflict more heavily are those in which the administrator gives inconsistent reasons for denial, fails to adequately investigate a claim, fails to credit a claimant's reliable evidence, or where the administrator has "repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of the evidence in the record."  Id. at 968-69.

In this instance, the Court finds that in addition to the presence of a structural conflict of interest, there is also some evidence to suggest that Zurich American's factual and legal determinations were not always the result of a fair and impartial process.  Though there is no evidence before the Court that Zurich American has a "parsimonious claims-granting history" or "smoking gun" evidence that would indicate conclusively that Zurich American's conflict played a role in denying plaintiff's claim, there is evidence in the record that indicates that Zurich American reached conclusions not supported by the factual record and ignored credible evidence that arose that undermined coverage decisions it made early in the review process.

In Abatie, the Ninth Circuit suggested that an administrator operating under a structural conflict of interest "may find it advisable to bring forth affirmative evidence that any conflict did not influence its decision making process."  Id. at 969.  This would include evidence "that it used truly independent medical examiners or a neutral, independent review process; that its

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-13

1   employees do not have incentives to deny claims; that its interpretations of the plan have been

2   consistent among patients; or that it has minimized any potential financial gain through structure

3   of its business (for example, through a retroactive payment system)." Id. at 969 n. 7.  Here

4   defendants seek to support the neutrality of their decision by pointing to the fact that they used

5   independent experts obtained through MedNet and offered plaintiff numerous opportunities to

6   challenge Zurich American's conclusions.

7        These facts do not alleviate the Court's concerns about the neutrality of Zurich

8   American's decision-making process in this case.  Though it is true that the reports of Dr. Lopez

9   and Dr. Rosen were obtained through an independent referral service, their independence is

10   negated by the fact that Zurich American repeatedly chose to only rely on evidence obtained in

11   those reports that supported its initial decision to deny coverage.  In doing so, Zurich American

12   failed to credit its own expert opinions as well as the opinion of plaintiff's reliable expert and

13   ultimately reached conclusions that were not supported by evidence in the record as it relates to

14   the dosage of alprazolam consumed by Mr. Hawthorne prior to his death.  In reviewing the

15   record, it appears that the procedures provided to plaintiff to submit evidence and challenge

16   Zurich American's conclusions were often provided more to create the appearance of due

17   process than to actually provide a forum for Zurich American to critically examine its

18   conclusions.  The presence of this conflict weighs in favor of reviewing Zurich American's

19   denial with a degree of skepticism.

20   **D.   Did Defendants' Denial of Benefits Constitute an Abuse of Discretion?**

21        An abuse of discretion occurs if (1) a decision is rendered without any explanation, (2)

22   provisions of the plan are construed in a way that conflicts with the plain language of the plan,

23   or (3) a benefit denial is made relying on clearly erroneous findings of fact.  Taft v. Equitable

24   Life Assurance Soc'y, 9 F.3d 1469, 1472-73 (9th Cir. 1993).  "The mere fact that the plan

25   administrator's decision is directly contrary to some evidence in the record does not show that

26

27   ORDER GRANTING PLAINTIFF'S MOTION
     FOR SUMMARY JUDGMENT AND DENYING
     IN PART AND GRANTING IN PART DEFENDANTS'
28   MOTION FOR SUMMARY JUDGMENT-14

the decision is clearly erroneous." Snow v. Standard Ins. Co., 87 F.3d 327, 331 (9th Cir. 1996), overruled on other grounds by Kearney v. Standard Ins. Co., 175 F.3d 1084, 1089-90 (9th Cir. 1999).

In this case, defendants denied plaintiff benefits after determining that Mr. Hawthorne's death was not a result of an accident, but rather the foreseeable result of a voluntary ingestion of prescription drugs that impaired his ability to drive in a safe manner.[2]  The question for the Court is whether this determination constituted an abuse of discretion.

After reviewing the record, the Court concludes that defendants, in denying benefits to plaintiff, abused their discretion.  As will be discussed below, defendants failed to acknowledge and investigate critical conclusions of both its own experts and plaintiff's reliable experts.  This resulted in findings of fact not supported by the record and in interpretations of the plain language of the AD&D plan that were inconsistent with ERISA federal common law.  Though the Court has concluded that Zurich American's conflict of interest influenced its decision making, the Court believes that Zurich American's decision in this case would have constituted an abuse of discretion even if no evidence of a conflict was present.

### 1. Did Mr. Hawthorne Take More Than His Prescribed Dose of Alprazolam on the Night of His Death?

Before determining whether Zurich American abused its discretion in concluding that Mr. Hawthorne's death was not "accidental," the Court must first determine which of Mr. Hawthorne's actions are at issue in this case.  Defendants argue that it was the decision to drive home late at night while "overmedicated on prescription drugs."  See Defendants Response at p. 22; Defendants' Motion at p. 22.  They have also characterized Mr. Hawthorne's actions as a "drug overdose" and the "ingestion of an excessive amount of a mind-altering drug."  Id.;

---

[2] Though Zurich American's original denial of benefits was based both on a finding that Mr. Hawthorne's death was not accidental and a determination that his death was covered by the "self-inflicted wound" exclusion, defendants have now abandoned their reliance on the latter.

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-15

1  Defendants' Reply at p. 3.

2  In making these conclusions, defendants rely heavily on the original toxicology tests that

3  indicate Mr. Hawthorne had a highly elevated amount of alprazolam in his system at the time of

4  death.  There is a difference, however, between concluding that there was a high concentration

5  of alprazolam in Mr. Hawthorne's system at the time of his autopsy, and making conclusions

6  about whether Mr. Hawthorne consumed more than his prescribed dose of alprazolam on the

7  night of his death.  Even if the Court assumes that the toxicology results are indeed accurate,

8  defendants' own experts, as well as plaintiff's expert, have indicated that they do not form an

9  adequate basis for concluding that Mr. Hawthorne actually consumed more than his prescribed

10  dose of alprazolam prior to his death.  As a result, the Court concludes that defendants' lacked

11  an adequate basis for their conclusion that Mr. Hawthorne took more alprazolam on the night of

12  his death than was prescribed.

13  Though defendants argue that both Dr. Rosen and Dr. Lopez concluded that "the high

14  level of alprazolam most likely indicated an overdose" of alprazolam, there is no support in the

15  record for such a contention.  See Defendants' Reply at p. 3.  Indeed, only one of defendants'

16  experts, Dr. Manning, explicitly concluded that Mr. Hawthorne consumed more than his

17  prescribed 2 mg dose of alprazolam, Doyle Decl, Ex. 14, and the soundness of that conclusion

18  was specifically challenged by another of defendants' experts, Dr. Lopez.  Doyle Decl., Ex. 25.

19  Dr. Lopez was retained by defendants after it was discovered that Dr. Manning made a

20  fundamental calculation error in arriving at his results.  In his report, Dr. Lopez disagreed with

21  Dr. Manning's conclusion that Mr. Hawthorne had 21-30 mg of alprazolam in his system at his

22  time of death, because it was his opinion that determinations are "difficult to calculate for any

23  medication due to a variety of reasons."  Id.  Dr. Lopez did not elaborate on the specific reasons

24  why such calculations are difficult, nor did Zurich American ask Dr. Lopez to elaborate on those

25  reasons.  Nevertheless, Zurich American denied benefits for the second time on July 27, 2005,

26

27  ORDER GRANTING PLAINTIFF'S MOTION
   FOR SUMMARY JUDGMENT AND DENYING
   IN PART AND GRANTING IN PART DEFENDANTS'
28  MOTION FOR SUMMARY JUDGMENT-16

citing the inherent risk both in driving after taking a prescribed dosage of alprazolam and in driving after taking a larger than prescribed dosage of alprazolam.  Jones Decl., Ex. P.

After plaintiff's counsel challenged the foundation of Zurich American's conclusion that Mr. Hawthorne exceeded his prescribed dosage on the night of his death, Zurich American sought Dr. Rosen's opinion and an updated opinion from Dr. Lopez.  Though both concluded that the presence of both fluoxetine and high levels of alprazolam played a role in Mr. Hawthorne's death, neither concluded that the high levels of alprazolam could be positively attributed to the ingestion of a larger than prescribed dosage of alprazolam.  In fact, Dr. Rosen specifically stated that she could not make such a conclusion due to the potential impact of fluoxetine on the levels of alprazolam:

> Regarding whether Mr. Hawthorne took more alprazolam than he should have, I would guess that this was possible.  However, the affect of Fluoxetine to increase the Alprazolam level needs to be considered.  It is possible that the level was increased to some extent by the effect of Fluoxetine on the metabolism of Alprazolam.

Jones Decl., Ex. T.  The record does not indicate that Zurich American ever followed up on Dr. Rosen's warning regarding the potential role of fluoxetine in explaining the higher levels of alprazolam found in Mr. Hawthorne's system.  Despite Dr. Rosen's warning, Zurich American again denied plaintiff's appeal without retracting its earlier conclusion that Mr. Hawthorne took a larger than prescribed dose of alprazolam.  Defendants maintain this stance in their summary judgment memoranda.

Dr. Lopez's original concerns with Dr. Manning's conclusions on dosage were later echoed by plaintiff's own expert, Dr. Levine, in his December 23, 2005 report:

> It is generally accepted in postmortem forensic toxicology that pharmacokinetic formulas used to predict dose in living people from a serum concentration could not be used to predict a dose from a postmortem blood concentration.  Therefore, in my opinion, Dr. Manning's prediction of a dose of alprazolam based on the chest blood concentration is not based on currently held principles in the field.

Jones Decl, Ex. V.  Dr. Levine also reached conclusions similar to those of Dr. Rosen as to the

potential affects of fluoxetine on the levels of alprazolam that would be found in the blood of someone who ingested both medications:

> The scientific literature indicates that co-administration of fluoxetine will increase the blood concentration of alprazolam because of its inhibitory effect on the metabolic system that the body uses to eliminate alprazolam. According to the Physician's Desk Reference, 2005 Edition, co-administration of fluoxetine and alprazolam led to an increased plasma concentration of alprazolam by 46%, a decrease in clearance by 21% and an increase in half-life by 17%. All of these factors will give the appearance that a larger dose was taken.

Id. He also noted that Mr. Hawthorne's alprazolam levels would be increased by the consumption of ranitidine (the generic name for Zantac). Id. Dr. de la Cruz's chart notes indicate that Mr. Hawthorne took Zantac for heartburn. Jones Decl., Ex. I. Zurich American did not follow up on Dr. Levine's concerns, nor did it ask any of its experts to respond to his report.

In defending Zurich American's conclusions regarding the dosage of alprazolam consumed by Mr. Hawthorne prior to his death, defendants place great weight on Dr. Lopez's and Dr. Rosen's rejection of plaintiff's attempt to attribute the high concentration of alprazolam to the redistribution of the drug after his death. Even if the effects of redistribution are ignored, however, defendants' claim that Mr. Hawthorne took more than his prescribed dose of alprazolam is still based solely on Dr. Manning's attempt to derive Mr. Hawthorne's dosage from post-mortem blood concentration results. Defendants do not address Dr. Lopez's or Dr. Levine's statements regarding the difficulty of predicting dosage from post-mortem blood concentration levels, nor do defendants explain why neither Dr. Rosen nor Dr. Lopez felt comfortable making conclusions regarding the dosage of alprazolam ingested by Mr. Hawthorne prior to his death.

Defendants seek to discount Dr. Levine's conclusion that the interaction of alprazolam and fluoxetine could have been responsible for the heightened levels of alprazolam in Mr. Hawthorne's system by arguing that such an effect would only account for an increase in the

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-18

concentration of alprazolam by 46 percent, "in contrast to the 5 to eleven fold increase over the therapeutic dose found in Mr. Hawthorne." Defendants' Motion at p. 12. n.11. Defendants do not address the potential additional effect of Zantac. Nor do they explain why their own expert, Dr. Rosen, reported that she could not conclude that Mr. Hawthorne took more than his prescribed dose for the same reason articulated by Dr. Levine.

Defendants' assertion that both experts "stated that the apparent accurate reading of fluoxetine levels therefore indicated that the reported level of alprazolam also was reasonably accurate" also lacks support in the record. Defendants' Reply at p. 4. Though Dr. Rosen noted that it was "interesting" that fluoxetine was at therapeutic levels in the original toxicology results, and that "[o]ne would think that the Fluoxetine level done on blood drawn form [sic] the chest would have increased significantly postmortem if the Alprazolam had had time to be increased," she did not conclude that Mr. Hawthorne took a larger than prescribed dose of alprazolam or that the .28 mg/L concentration identified in the original toxicology result was accurate. Jones Decl., Ex. T. In fact, Dr. Rosen specifically stated in her report that "[u]sing a drug level post mortem is fraught with inaccuracies." Id. Dr. Rosen's report also notes that if the blood sample "was drawn at the scene immediately after the accident the blood level would reflect more accurately the patietn's [sic] blood level at the time of the accident," and that if the sample was taken later "one might guess that the peripheral blood level was close to .19 mg/L (.28 divided by 1.5)."[3] Id. Further, Dr. Rosen concluded that because the blood sample was taken from the chest, and not the femoral vein where a measurement is more accurate, the level of alprazolam was likely inflated by a factor of 1.5 in the toxicology results.[4] Dr. Rosen also

_____

[3] After receiving Dr. Rosen's report, Zurich American confirmed that the blood sample was taken during the autopsy, not at the scene of the accident. Doyle Decl., Ex. 34.

[4] Dr. Levine, in his report, points out that studies indicate that heart blood to femoral blood concentration ratios do indeed vary between a range of 1.0 to 6.3, but that the exact ratio cannot be predicted in this case. "Therefore, to randomly select a heart blood to peripheral blood ratio of 1.5 as

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-19

1   noted, without further elaboration, that "[a]nother difficulty occurs when levels are done on

2   blood and not on serum as they are clinically." Id.

3       To the extent that Zurich American based its denial of coverage on a conclusion that Mr.

4   Hawthorne took a larger than prescribed dose of alprazolam, the Court finds that it was contrary

5   to the evidence provided by its own experts and an abuse of discretion.  Though defendants are

6   correct that "the power to choose between medical sources that have rendered different opinions

7   is the kind of discretion to which an administrator is entitled," Helsing v. Standard Insurance

8   Company, 230 F. Supp. 2d 1200, 1205 (D. Or. 2001), this is not a case of an administrator

9   weighing the conflicting determinations of its own experts with those provided by plaintiff's

10  experts.  Here, it is clear that defendants ignored the clear warnings of both its own experts and

11  those of plaintiff's qualified expert in reaching a conclusion that was unsupported by the facts

12  on the record.  See Zavora v. Paul Revere Life Ins. Co., 145 F.3d 1118, 1123 (9th Cir. 1998);

13  Govindarajan v. FMC Corp., 932 F.2d 634, 637 (7th Cir. 1991) (selective review of medical

14  evidence and a conclusion based on that selectivity was unreasonable as well as arbitrary and

15  capricious).

16      **2.    Was Mr. Hawthorne's Death an "Accident" Under ERISA Federal Common
            Law**

17
        A death is deemed accidental under ERISA federal common law if the death was
18
    "unexpected or unintentional." Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1126 (9th Cir.
19
    2002).  In determining whether a death was "unexpected or unintentional" the Court must
20
    undertake an overlapping subjective and objective inquiry:
21

22          The court first asks whether the insured subjectively lacked an expectation
            of death or injury.  See Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d
23          1077, 1088 (1st Cir. 1990) ("Requiring an analysis from the perspective of
            the reasonable person in the shoes of the insured fulfills the axiom that
24

25  used by Dr. Rosen in her report would not be scientifically acceptable based on the range that appears in

26  the peer-reviewed literature." Jones Decl., Ex. V.

27  ORDER GRANTING PLAINTIFF'S MOTION
    FOR SUMMARY JUDGMENT AND DENYING
    IN PART AND GRANTING IN PART DEFENDANTS'
28  MOTION FOR SUMMARY JUDGMENT-20

accident should be judged from the perspective of the insured.").  If so, the court asks whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences.  See id.  If the subjective expectation of the insured cannot be ascertained, the court asks whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain to result from the insured's conduct.

Padfield, 290 F.3d at 1126.  Based on the undisputed evidence in the case, the Court concludes that Zurich American abused its discretion when it concluded that Mr. Hawthorne's death was not "accidental" under ERISA federal common law.

Aside from a few instances of baseless speculation on the part of Zurich American's medical experts,[5] there is no evidence in the record that would lead this Court to conclude that Mr. Hawthorne had a subjective expectation of death when he left work for home in the early morning of February 8, 2004.  Nor do defendants argue that Mr. Hawthorne had a subjective expectation of death or injury.  Instead, defendants contend that Mr. Hawthorne's subjective expectation was not objectively reasonable "because death is a highly foreseeable result of driving late at night while overmedicated on prescription drugs," Defendants' Motion at p. 22, and because "a reasonable person would know . . . that driving under the influence of alprazolam was dangerous."  Defendants' Opposition at p. 19..

Defendants rely on the incorrect standard in determining whether Mr. Hawthorne's death was "accidental."  See Defendants' Response at pp. 21-22.  The relevant question is not whether death was a "highly foreseeable" consequence of Mr. Hawthorne's actions or if Mr. Hawthorne's actions made a "substantial contribution" to the cause of death or if a reasonable

_____

[5] Though Mr. Hawthorne had grappled with issues of depression, as is evidenced by Dr. de la Cruz's decision to prescribe him medications to address the issue, there is no evidence that Mr. Hawthorne was suicidal.  Defendants have stated that Dr. Rosen's speculation on this issue did not serve as a basis for Zurich American's denial of plaintiff's appeal.  See Defendants' Reply at p. 2.

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-21

1  person would have known that driving while using alprazolam was "dangerous."  The relevant

2  inquiry is whether a reasonable person in Mr. Hawthorne's shoes would believe that death was

3  "substantially certain" to result from ingesting a combination of alprazolam and fluoxetine as

4  prescribed by his physician prior to driving home from work in the early morning hours on the

5  day of his death.  Padfield, 290 F.3d at 1126-27.

6        This standard is drawn from Wickman v. Northwestern Nat. Ins. Co., 908 F.2d 1077,

7  1088 (1st Cir. 1990).[6]  In Wickman, the deceased had climbed over the guardrail of a bridge and

8  was holding on with one hand at the time he fell to his death.  Applying the standard to the facts,

9  the court concluded that "given the height of the bridge, the narrow foothold, that Wickman

10  possessed no extraordinary gymnastic, acrobatic, or other athletic skills, and the absence of

11  evidence that would have enabled him to hold on," a reasonable person would have "expected to

12  die or be seriously injured" and that "any other expectation would be unreasonable."  Id. at

13  1089.

14        Defendants point to a number of cases where courts have applied the Wickman test and

15  concluded that the death of drivers under the influence of alcohol is not an "accident" for the

16  purposes of an ERISA-governed accident policy.  Defendants' Motion at pp. 20-21.  These

17  cases, however, are rooted in an assumption that "the hazards of drinking and driving are widely

18  known and widely publicized."  Eckelberry v. Reliastar Life Ins. Co., 469 F.3d 340, 344-45 (4th

19  Cir. 2006) (surveying various circuit and district courts which have applied the Wickman test in

20  cases involving the deaths of drunk drivers).  In this instance, defendants have offered no

21  material evidence that would indicate that the hazards of driving after taking a combination of

22  prescription alprazolam and fluoxetine are "widely known and widely publicized."

23        Nor does the record contain evidence that Mr. Hawthorne was specifically warned that

24

25        [6] Zurich American cited Wickman in its July 27, 2005 letter upholding its denial of benefits.  Jones

26  Decl., Ex. P.

27  ORDER GRANTING PLAINTIFF'S MOTION
   FOR SUMMARY JUDGMENT AND DENYING
   IN PART AND GRANTING IN PART DEFENDANTS'

28  MOTION FOR SUMMARY JUDGMENT-22

driving while on his prescription medication would make his death "substantially certain."  After

receiving Dr. Lopez's first report, Zurich American recognized the importance of determining

whether Mr. Hawthorne was in fact warned of the dangers of driving under the influence of

alprazolam, and in April 2005 retained the RSB to determine what warnings he may have

received.  Doyle Decl., Ex. 26.  This investigation resulted in only one piece of speculative

evidence to support defendants' claim that Mr. Hawthorne was warned of the dangers of taking

alprazolam, and that was a letter from Dr. de la Cruz indicating that she "typically" warned

patients that alprazolam "can cause sedation and should be avoided if driving."  Doyle Decl., Ex.

27.  The RSB report also indicated that the State of Washington had no laws requiring any

particular warnings or instructions for alprazolam and that any warnings given at the pharmacy

varied depending on an individual pharmacist's judgment.  The record contains no indication

that Mr. Hawthorne's pharmacist was ever contacted.  Doyle Decl., Ex. 29.

Defendants contend that "Zurich American acted within its discretion in giving more

credence to Dr. de la Cruz's statement that she typically gives such a warning rather than to

Plaintiff's self-serving declaration, made nearly 18 months after the fact, that she remembered

the specific details of a conversation with her husband's physician."  Defendants' Reply at pp.

5-6.  Dr. de la Cruz's chart notes, however, are more consistent with plaintiff's recollection of

Mr. Hawthorne's appointment than Zurich American's theory.  Jones Decl., Ex. I.  Dr. de la

Cruz's notes contain no indication that she actually warned Mr. Hawthorne of the dangers of

driving while taking alprazolam.  They do, however, have a specific notation indicating that she

warned Mr. Hawthorne not to consume alcohol while taking alprazolam.  Id.  One would expect

that Dr. de la Cruz would have provided a notation of all the warnings she provided to Mr.

Hawthorne if she deemed it important enough to make a notation of similar warnings given to

Mr. Hawthorne.  This is especially true of warnings that defendants maintain would implicate

Mr. Hawthorne's very survival.

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-23

1    Even if Mr. Hawthorne was in fact given a warning of some sort, defendants have put

2  forward no evidence that would support the contention that a reasonable person in Mr.

3  Hawthorne's position, after hearing such a warning, should have known that death was

4  "substantially certain" to result from taking alprazolam and fluoxetine prior to driving.  Dr. de la

5  Cruz's letter indicates only that she "typically" advises patients "that medications such as

6  alprazolam can cause sedation and should be avoided if driving or while drinking alcohol."

7  Doyle Decl., Ex. 27.  She does not indicate that patients are told that death is "substantially

8  certain" to result if they were to drive while on alprazolam,[7] nor does her claimed warning

9  approach that level of specificity or urgency.  And though defendants provide no evidence of

10  what warning labels, if any, would have been present on Mr. Hawthorne's prescription bottles,

11  Dr. Lopez, defendants' expert and a board-certified toxicologist, speculated that the bottles

12  containing Mr. Hawthorne's alprazolam and fluoxetine prescriptions would have had warning

13  labels indicating that the drugs "MAY CAUSE DROWSINESS" and to "USE CARE WHEN

14  OPERATING A CAR OR DANGEROUS MACHINERY."  Jones Decl., Ex. S.  There is a

15  significant difference between knowing that you need to "use care" while driving under the

16  influence of medication or that such medication "may cause drowsiness" and having an

17  understanding that you are "substantially certain" to die if you drive after taking such

18  medications.  If one was "substantially certain" to die after taking such drugs, one would expect

19  that the warning would tell those taking the medications not to drive because driving would put

20  their lives in danger.  It is not reasonable to expect an individual in Mr. Hawthorne's position to

21

22    [7] Even if it were assumed that Dr. de la Cruz did in fact warn Mr. Hawthorne as she "typically"
23  did, the record, including Dr. De la Cruz's letter, contains no evidence that Mr. Hawthorne was ever
     warned of the potential effects of taking alprazolam and fluoxetine together.  Dr. Lopez indicated that
24  "the combination of both fluoxitine [sic] and alprazolam would have additive effects on an individual
     subjecting them to more central nervous system effects like dizziness, drowsiness, and sleepiness," and
25  that it was the drugs "in combination" that impaired Mr. Hawthorne's ability to drive and cause him to
     lose control of his vehicle and leave the road.  Doyle Decl., Ex. 25.
26

27  ORDER GRANTING PLAINTIFF'S MOTION
     FOR SUMMARY JUDGMENT AND DENYING
28  IN PART AND GRANTING IN PART DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT-24

know more about the potential dangers of driving while taking his prescribed medication than a board-certified toxicologist, nor does the record indicate that an expectation that death would be "substantially certain" to result would be accurate.  The Court concludes that defendants have put forward no evidence to support its contention that a reasonable person in Mr. Hawthorne's position would not have "expected to die or be seriously injured" as a result of driving while on his medications.  Plaintiff's motion for summary judgment is granted.

**E.    Plaintiff's Remaining Claims**

Plaintiff does not contest defendants' motion for summary judgment on both her claims under 29 U.S.C. § 1109 and her request for equitable and injunctive relief.  Defendants' motion is therefore granted in this regard.

Plaintiff provides only a bare bones response to defendants' motion for summary judgment with regard to her claim for recovery under 29 U.S.C. § 1132(a)(1)(A).  This provision allows a beneficiary to sue for relief under Section 1132(c) which provides that if a plan fails to provide a claimant with certain requested documentation promptly, then the Court may order the plan administrator to pay a claimant up to $100 per violation per day of delay.  The Court need not determine whether financial penalties are appropriate in this instance, because plaintiff has put forward no evidence that any failure to turn over documents was prejudicial or done in bad faith.  See Nunez v. Monterey Peninsula Eng'g, 867 F. Supp. 895, 911 (N.D. Cal. 1994).  Defendants' motion for summary judgment is granted on this issue.

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-25

## IV. CONCLUSION

For all the foregoing reasons, plaintiff's motion for summary judgment (Dkt. #13) is GRANTED.[8]  Defendants' motion for summary judgment (Dkt. #16) is GRANTED IN PART and DENIED IN PART.

DATED this 18th day of June, 2007.

*MNt S Lasnik*

Robert S. Lasnik
United States District Judge

---

[8] A disbursement of benefits is the appropriate remedy, not a remand to the plan administrator. "[A] plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts." Grosz-Salomon v. Paul Revere Life Ins., 237 F.3d 1154, 1163 (9th Cir. 2001).  As was the case with the defendant in Grosz-Solomon, Zurich American "applied the right standard, but came to the wrong conclusion." Id.  In such instances, "remand is not justified." Id.

ORDER GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
IN PART AND GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT-26